UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID MATTHEWS and ASHLEY DEIBERT,<br><br>Plaintiffs,<br><br>– against –<br><br>GRAPESHOT INC., ORACLE CORPORATION, KURT KRATCHMAN, MARK ASHWORTH and JOHN SNYDER,<br><br>Defendants. | Civil Action No.:<br><br><br><br>**COMPLAINT** |

Plaintiffs, David Matthews ("Matthews") and Ashley Eckel Deibert ("Deibert") (collectively, "Plaintiffs"), by their attorneys, A.Y. Strauss LLC, for their Complaint against the defendants Grapeshot Inc. ("Grapeshot"), Oracle Corporation ("Oracle"), Kurt Kratchman ("Kratchman"), Mark Ashworth ("Ashworth") and John Snyder ("Snyder") (collectively, "Defendants"), allege as follows:

1. This case centers on an illegal scheme perpetrated by Grapeshot and several of its senior executives against each Plaintiff (who were then Grapeshot employees) on the eve of Oracle's acquisition of Grapeshot in 2018. By concealing the planned sale of Grapeshot to Oracle (a sale which has now been consummated), Defendants defrauded each Plaintiff into trading away certain valuable contractual rights, which would have been triggered in the event of a "change in control" of Grapeshot, thus depriving the Plaintiffs of significant sums to which they would have otherwise been entitled under their employment contracts with Grapeshot.

2. The Defendants' scheme is shocking both in its brazenness and in the deceitful (and virtually scripted) manner in which they perpetrated it against each Plaintiff, as more fully described below.

3. Defendants' actions, collectively and individually, constitute flagrant violations of both contract and tort law. This unscrupulous conduct by the Defendants cannot be allowed to stand.

## THE PARTIES

4. Plaintiff Matthews is an individual currently residing in Middletown, New Jersey.

5. Plaintiff Deibert is an individual currently residing in Philadelphia, Pennsylvania.

6. Defendant Grapeshot is a Delaware corporation registered to transact business in the State of New York and which, during the time period relevant for the events underlying this action, maintained a place of business in New York City.

7. Defendant Oracle is a Delaware corporation headquartered in Redwood Shores, California. Oracle is registered to transact business in the State of New York and has several offices located in New York City, including on Park Avenue.

8. Defendant Kratchman is an individual who, upon information or belief, resides in New York City. At all relevant times for purposes of this action, Kratchman was a senior officer or executive employed by Grapeshot.

9. Defendant Ashworth is an individual who, upon information or belief, resides in the United Kingdom. At all relevant times for purposes of this action, Ashworth was a senior officer or executive employed by Grapeshot.

10. Defendant Snyder is an individual who, upon information or belief, resides in the United Kingdom. At all relevant times for purposes of this action, Snyder was a senior officer or executive employed by Grapeshot.

## JURISDICTION AND VENUE

11. This Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the parties to this action are diverse in their citizenship or state of incorporation.

12. Venue is appropriate in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district, and the Defendants are, upon information and belief, subject to the court's jurisdiction with respect to this action in this district.

## STATEMENT OF FACTS

13. Grapeshot had been the U.S. subsidiary of a U.K. company called Grapeshot Limited ("Grapeshot Ltd.") based in Cambridge, England. Grapeshot and its U.K. parent were technology companies specializing in "brand safety" advertising technology. In simple terms, "brand safety" advertising technology is designed to ensure that a client's branded content and commercial offers do not appear on disreputable websites or get placed alongside negative or unappetizing news stories or other material.

14. In 2017, each Plaintiff was then a successful executive employed by other technology-based marketing companies. At that time, each Plaintiff was asked – separately but closely in time – to leave their then current (and secure) employment and join Grapeshot. These overtures for employment were based on an aggressive campaign by and on behalf of Grapeshot, although significant – and material – information about Grapeshot's plans was either withheld from each Plaintiff or falsely represented to the Plaintiffs during their recruitment.

15. For Matthews, the story started in or about the summer of 2017, when he was approached about a potential employment opportunity with Grapeshot in New York City. At the

time, Matthews was the Chief Revenue Officer for a company called 4INFO, Inc., an ad-tech company specializing in identity graph and cross-channel advertising (technology designed to recognize an online user across channels and devices at every step of that person's online activities).

16. At the time, Matthews's total compensation package with 4INFO was worth approximately $500,000 per year, and he also held valuable stock options in the company.

17. By October 2017, Matthews had interviewed – extensively – with representatives of Grapeshot, including but not limited to Defendant Kratchman, who was then Grapeshot's Chief Operating Officer, as well as Defendants Ashworth and Snyder (among others). The recruiting process continued for several months, as Grapeshot actively – indeed aggressively – pursued Matthews and encouraged him to leave his then secure position with 4INFO to join Grapeshot.

18. To illustrate the lengths that Grapeshot went to lure Matthews to leave 4INFO and join Grapeshot, Grapeshot asked Matthews to participate in more than 15 separate meetings and interviews in a two-month span.

19. After Matthews signed a non-disclosure agreement in late October 2017, at Grapeshot's demand, Grapeshot gave Matthews certain financial information about its business plan for the coming year (2018).

20. Grapeshot's campaign to entice Matthews to leave his then current position and join Grapeshot as its Global Head of Revenue succeeded. After a period of negotiation over certain terms, the parties entered into a written employment agreement dated as of November 23, 2017. Notably, the written agreement included – as insisted upon by Matthews – a "change in control" clause as more fully described below.

21. Grapeshot's recruitment of the Plaintiff Deibert occurred at almost the same time and followed a similar pattern. At the time, Deibert was a Vice President with iQ Media Group Inc., earning over $200,000 per year. Similar to Matthews, Deibert also held valuable stock options in her then employer.

22. After first learning in August 2017 that Grapeshot reportedly had an available position that seemed well-suited for her, Deibert interviewed with a Grapeshot representative for the first time the following month (on or about September 15, 2017).

23. Grapeshot's pace of recruiting Deibert intensified, with several more interviews in October 2017, including separate interviews that Defendants Kratchman and Snyder each attended.

24. Later that month, Grapeshot sent Deibert a series of proposed employment offer letters, with the final employment agreement being signed on or about October 19, 2017 (with Snyder signing on Grapeshot's behalf). Significantly, Deibert (similar to Matthews, but independently) had asked for – and received – a "change in control" clause, which was memorialized in her final employment agreement.

25. Significantly, during their respective recruitment interviews, both Plaintiffs – independent of each other – asked Grapeshot's representatives the natural questions about Grapeshot's plans, both in the near term and long term. Both were told similar, if almost identical tales (now known to be false) about Grapeshot being in the process of "re-capitalization" in connection with a new round of "outside financing".

26. Moreover, each Plaintiff was told by some or all of the Defendants – in sum and substance – that Grapeshot's then current strategy involved growing the company for the next three years, i.e. 2018, 2019 and 2020, to hopefully reach a valuation approaching $1 billion before then (*after* 2020) possibly being sold to another company.

27. Despite these statements about a growth strategy of three or more years in advance of a possible sale of Grapeshot, what the Defendants knowingly and wrongfully hid from each Plaintiff was the true state of affairs – namely, that at that very time, the Defendants (including some of the very executives who were then enticing the Plaintiffs to leave their secure employment) were *already* in active negotiations with Oracle, then an existing business partner of Grapeshot Ltd. in the U.K., concerning Oracle's acquisition of both Grapeshot Ltd. and Grapeshot.

28. Indeed, those negotiations had already sufficiently progressed to the point that as of late 2017, Oracle's acquisition of Grapeshot was virtually certain to occur. Nevertheless, the Oracle situation (or any possible imminent acquisition, for that matter) was never once mentioned during the Defendants' repeated meetings with the Plaintiffs prior to their accepting their employment offers from Grapeshot.

29. The Defendants' apparent motivation for bringing the Plaintiffs to Grapeshot (while concealing the potential acquisition by Oracle) was that Grapeshot Ltd. was pushing for strong revenue projections (to increase Oracle's ultimate purchase price). To accomplish these targets, each Plaintiff would be highly instrumental as team leaders and help Grapeshot make or exceed those projections for the U.S. market. In fact, as soon as the Plaintiffs were brought on board, Grapeshot immediately tasked each to drive revenue and do it fast.

30. For example, three of the five Grapeshot senior vice presidents who would be reporting to Matthews and two of the vice presidents reporting to those same senior vice presidents were all reportedly considering leaving the company. If they left, their departures would have dramatically hurt Grapeshot Ltd.'s ability to produce revenue and meet their global revenue projections. Even worse, the Oracle team had already met some of these key revenue managers (in connection with Oracle's ongoing business with Grapeshot) and Oracle would have undoubtedly

been unhappy if those individuals left prior to the planned acquisition. Grapeshot's hiring of Matthews was integral to keeping that team together and operating productively.

31.     As already noted, upon commencing their employment with Grapeshot, the Plaintiffs' respective employment agreements with Grapeshot included grants of stock options in Grapeshot Ltd. (Matthews held options for 13,000 shares, and Deibert for 9,500 shares), along with change of control provisions mandating *immediate* vesting of their stock options upon Grapeshot Ltd.'s acquisition by another company, among other triggering events.

32.     For example, Matthews' original employment contract stated that in the event of a change of control in Grapeshot's ownership (defined as, among other things, an acquisition by another entity), then "100% of [his] unvested options from this grant and any subsequent grants, if any, *shall vest immediately*" (emphasis added).

33.     However, in early 2018, Kratchman, Ashworth and Snyder, on behalf of Grapeshot and acting through Grapeshot's Global Head of Human Resources, misrepresented to each Plaintiff (separately) that Grapeshot's change of control provisions in their employment agreements had resulted from a "clerical error" in Grapeshot's offer letter (which actually involved several draft offers) and further claimed – falsely – that no one at Grapeshot Ltd. or Grapeshot had such a change of control clause as part of their employment arrangements.

34.     Accordingly, the Defendants pressured each Plaintiff – separately but again, under almost identical circumstances – that he or she should sign a contract amendment making accelerated vesting discretionary, rather than mandatory.

35.     Once again, at the exact time the Defendants were peddling their fake "clerical error" story, they were well aware (although the Plaintiffs, by virtue of their positions, were not) that the planned Oracle acquisition was now imminent. To induce each Plaintiff to sign the

employment amendment, the Defendants knowingly and purposely omitted any mention of even the existence of acquisition negotiations between Grapeshot Ltd. and Oracle (or any potential purchaser, named or unnamed), let alone that the Oracle deal was nearing consummation.

36. The Defendants' demand that each Plaintiff agree to surrender their change of control clause had an ominous subtext. As all parties were well aware, each of the Plaintiffs were still within their "probationary period" of employment (since they had only recently been hired) and, as such, Grapeshot could theoretically terminate each of them for any reason (or for no reason) without any incurring contractual liability or severance obligation.

37. Under these circumstances, each Plaintiff signed the requested contract amendment, reasonably relying on the Defendants' good faith and accepted the stated reason of a "clerical error" at face value. (Certain other Grapeshot executives, who had also asked for and received a change of control clause when they began their Grapeshot employment, were reportedly duped in the same way – yet more "clerical errors" that had to be tidied up.)

38. In the case of Deibert, Grapeshot went so far as to offer her a monetary "gift" to apologize for the inconvenience caused by the supposed "clerical error".

39. Her gift would ultimately take the form of a paltry discretionary bonus of $1,500.

40. It is important to note the operative dates here. For both Plaintiffs, the Grapeshot paperwork amending the employment terms (thus eliminating their valuable "change of control" protections) were dated as of January 15, 2018. And at almost precisely the same time, Oracle's acquisition of Grapeshot Ltd. and Grapeshot was already a "done deal". Specifically, at the same time Grapeshot was pressuring each Plaintiff into signing away their change of control rights, Grapeshot was advising other Grapeshot executives (but not yet the Plaintiffs) about Oracle's acquisition.

41. As it turned out, on or about February 23, 2018, Matthews would be informed over the phone about Oracle's acquisition in a formal "read in" call. He was in Singapore at the time working on Grapeshot business.

42. Deibert would only learn of the acquisition in April 2018 when it was publicly announced. Specifically, Oracle publicly announced on April 24, 2018 that it had entered into an agreement to acquire Grapeshot Ltd. (which would include Grapeshot, its U.S. subsidiary).

43. But all indications reveal that the Defendants had been actively meeting with Oracle to discuss the acquisition as early as October 2017, if not earlier, and that all material terms governing the acquisition had been effectively concluded by the start of January 2018, if not sooner.

44. After Oracle's public announcement, people within Grapeshot were subsequently informed that Oracle's acquisition was "due to complete [sic] on Tuesday 15 May 2018."

45. Both Plaintiffs, as well as others, were told (on May 11, 2018, a Friday) that since they had been granted options in Grapeshot (but none were actually issued), these "promised options" had to be converted to Restricted Stock Units (RSU's) in Oracle, and that they had to formally agree to this conversion "by no later than 4pm (UK time) on Monday 14 May 2018" (i.e. by Monday morning U.S. time). To add to the pressure, they were also told that failure to sign the conversion documentation (dubbed an "Ungranted Option Waiver Agreement") could jeopardize the Oracle acquisition.

46. However, key aspects underlying the proposed conversion (including but not limited to the requirements and timetable for exercising the Oracle RSU's) were deliberately withheld from the Plaintiffs. As an example, the purported "Waiver Agreement" contained the nebulous statement that the RSU's "will have a vesting schedule and be subject to such other terms

9

and conditions as Parent [Defendant Oracle], Parent [sic] or any Parent Affiliate determines in its sole discretion."

47.     Each Plaintiff asked to have a better understanding of the proposed exchange of the Grapeshot options for the Oracle RSU's, but the Defendants brushed them off. A video conference held in the early afternoon of May 11, 2018 (just a few hours after the Plaintiffs were first presented with the 14-page conversion document) provided almost no meaningful information.

48.     For example, when Matthews asked for a copy of the Share Purchase Agreement between Oracle and Grapeshot (referenced in the Waiver Agreement) or the phantom "vesting schedule" (also mentioned in the Waiver Agreement but not included or even described), Defendant Ashworth responded, in sum and substance, that "all those documents are public and the information is online … if you search around for it." His words, like so many others spouted by the Defendants in this case, were false.

49.     After the May 12-13 weekend, and under the time pressure imposed by the Defendants, each of the Plaintiffs reluctantly signed and returned the conversion paperwork, thereby converting their Grapeshot options into restricted Oracle units.

50.     Oracle's acquisition closed on schedule on May 15, 2018. Published reports at the time hinted that the price tag may have been as high as $400 million.

51.     Upon consummation of its purchase, Oracle became the successor to Grapeshot and, for all intents and purposes, took over Grapeshot's operations and continued Grapeshot's business without interruption.

52.     The Defendants Kratchman, Ashworth and Snyder, given their insider status at Grapeshot, received or became entitled to millions of dollars upon consummation of the acquisition by Oracle. The Plaintiffs did not.

53. Since each Plaintiff had been defrauded into surrendering their "change of control" rights, neither Plaintiff was contractually entitled to vest their options upon Oracle's completed acquisition, which (by the Defendants' presumed design) created a larger pool of money for the Defendants Kratchman, Ashworth and Snyder to divvy up amongst themselves.

54. On June 26, 2018, Kratchman met with Deibert in Grapeshot's New York office and informed her that she would <u>not</u> be receiving an offer to continue with Grapeshot or its successor Oracle. Kratchman made clear that the lack of an offer was in no way due to Deibert's work performance, but that nevertheless her employment with Grapeshot was being terminated, which termination would become effective three days later.

55. On that very same day (June 26), Kratchman telephoned Matthews and informed him that his employment with Grapeshot was being terminated. Once again, Kratchman made clear that the termination was <u>not</u> performance based, and Matthews' termination would also become effective three days later.

56. To probably no one's surprise, the termination of both Plaintiffs was carried out <u>before</u> the date by which a grantee of Grapeshot Ltd. stock options (or the substituted Oracle RSU's) would have to remain employed to actually receive any Oracle stock options. In other words, the Oracle RSU's were now worthless to the Plaintiffs.

57. Thus, in accordance with the Defendants' illicit plans, each Plaintiff had been terminated in a manner designed to wrongfully deprive them of any benefits from Oracle's acquisition of Grapeshot.

58. The severance that Grapeshot ultimately paid to each Plaintiff was a mere pittance in comparison with the values of the 13,000 and 9,500 Grapeshot Ltd. stock options that Matthews

and Deibert had originally been granted, respectively, which would have vested immediately upon Oracle's acquisition but for the Defendants' wrongful conduct.

59. Accordingly, this action follows.

## FIRST COUNT
### (Fraudulent Inducement – Matthews' Employment by Grapeshot)

60. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the foregoing paragraphs, with the same force and effect as if fully set forth herein.

61. Defendants, including Kratchman and Ashworth and through them Grapeshot, made misrepresentations of material existing facts to Matthews with respect to his joining Grapeshot and leaving 4INFO that were false and known to be false or recklessly made by them, to induce him to rely on those misrepresentations, which Matthews justifiably did, resulting in injury to him.

62. By reason of the foregoing, Matthews has been damaged in the minimum amount of $6,000,000.

63. Matthews is also entitled to punitive damages, since the Defendants acted with malice, wantonly or with reckless indifference in their actions towards him.

## SECOND COUNT
### (Fraudulent Inducement – Deibert's Employment by Grapeshot)

64. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the foregoing paragraphs, with the same force and effect as if fully set forth herein.

65. Defendants, including Kratchman and Ashworth and through them Grapeshot, made misrepresentations of material existing facts to Deibert with respect to her joining Grapeshot and leaving iQ Media that were false and known to be false or recklessly made by them, to induce her to rely on those misrepresentations, which Deibert justifiably did, resulting in injury to her.

12

66. By reason of the foregoing, Deibert has been damaged in an amount of not less than $1,000,000.

67. Deibert is also entitled to punitive damages, since the Defendants acted with malice, wantonly or with reckless indifference in their actions towards her.

## THIRD COUNT

### (Fraudulent Inducement – Change of Control for Matthews)

68. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the foregoing paragraphs, with the same force and effect as if fully set forth herein.

69. Defendants, including Kratchman and Ashworth and through them Grapeshot, made material misrepresentations and/or omissions of material existing facts to Matthews in order to induce him to amend the change of control provisions in his employment agreement (in order to make automatic vesting discretionary rather than mandatory), and these representations and omissions were false or fraudulent, and known to be false or recklessly when made by the Defendants.

70. Moreover, when making these material misrepresentations and omissions, the Defendants intended that Matthews would rely on those misrepresentations and omissions, which he justifiably did, resulting in injury to him.

71. By reason of the foregoing, Matthews has been damaged in the minimum amount of $520,000.

72. In addition, Matthews is also entitled to punitive damages, since the Defendants acted with malice, wantonly or with reckless indifference in their actions towards him.

## FOURTH COUNT

### (Fraudulent Inducement – Change of Control for Deibert)

73. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the foregoing paragraphs, with the same force and effect as if fully set forth herein.

74. Defendants, including Kratchman and Ashworth and through them Grapeshot, made material misrepresentations and/or omissions of material existing facts to Deibert in order to induce her to amend the change of control provisions in her employment agreement (in order to make automatic vesting discretionary rather than mandatory), and these representations and omissions were false or fraudulent, and known to be false or recklessly when made by the Defendants.

75. Moreover, when making these material misrepresentations and omissions, the Defendants intended that Deibert would rely on those misrepresentations and omissions, which she justifiably did, resulting in injury to her.

76. By reason of the foregoing, Deibert has been damaged in the minimum amount of $380,000.

77. In addition, Deibert is also entitled to punitive damages, since the Defendants acted with malice, wantonly or with reckless indifference in their actions towards her.

## FIFTH COUNT

### (Breach of Contract claimed by Plaintiff Matthews)

78. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the foregoing paragraphs, with the same force and effect as if fully set forth herein.

79. Grapeshot had agreed to pay Matthews his $75,000 earned second quarter 2018 bonus in full, but only paid $52,000 of that earned bonus, leaving $23,000 due and owing to Matthews.

80. As a result of that failure to make full payment, Grapeshot has breached its agreement with Matthews.

81. Matthews had performed all the relevant terms and conditions of his agreement with Grapeshot.

82. By reason of Grapeshot's breach of the foregoing agreement, Matthews has been damaged in the amount of not less than $23,000.

## SIXTH COUNT
### (Breach of Contract claimed by Plaintiff Deibert)

83. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the foregoing paragraphs, with the same force and effect as if fully set forth herein.

84. Grapeshot had agreed to pay Deibert a bonus of $57,500 for 2018, but failed to do so, even on a pro rata basis for the six months of her employment in 2018.

85. As a result of that failure to make full payment, Grapeshot has breached its agreement with Deibert.

86. Deibert had performed all the relevant terms and conditions of her agreement with Grapeshot.

87. By reason of Grapeshot's breach of the foregoing agreement, Deibert has been damaged in the amount of not less than $28,750.

## SEVENTH COUNT
### (Conversion claimed by Plaintiff Matthews)

88. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the foregoing paragraphs, with the same force and effect as if fully set forth herein.

89. On or after June 26, 2018, Grapeshot assumed the right of ownership over certain personal property belonging to Matthews in and around his desk area in his office at Grapeshot's New York offices.

90. The assumption by Grapeshot of right of ownership over such personal property was without authorization by Matthews, and Grapeshot has continued to exercise ownership and dominion to the exclusion of Matthews over such property even though he has made a demand for return of such property and Grapeshot has been under an obligation to return such property.

91. By reason of Grapeshot's acts of conversion, Matthews has been damaged in an amount not less than $750.

## **DEMAND FOR RELIEF**

WHEREFORE, the Plaintiffs David Matthews and Ashley Eckel Deibert demand judgment against each of the Defendants, jointly and severally, as follows:

    a.    on the first count in the minimum amount of $6,000,000, the precise amount to be determined at trial, plus punitive damages of $18,000,000;

    b.    on the second count in the minimum amount of $1,000,000, the precise amount to be determined at trial, plus punitive damages of $3,000,000;

    c.    on the third count in the minimum amount of $520,000, the precise amount to be determined at trial;

    d.    on the fourth count in the minimum amount of $380,000, the precise amount to be determined at trial;

    e.    on the fifth count in the minimum amount of $23,000, the precise amount to be determined at trial;

  f. on the sixth count in the minimum amount of $28,750, the precise amount to be determined at trial;

  g. on the seventh count in the minimum amount of $750, the precise amount to be determined at trial; and

  h. awarding the Plaintiffs their costs, attorneys' fees, and such other and further relief, including pre-judgment and post-judgment interest, to which they may be entitled.

Dated: July 28, 2020

**A.Y. STRAUSS LLC**
*Attorneys for Plaintiffs*

*/s/ Evan M. Goldman*
Evan M. Goldman, Esquire
Glenn M. Azzinari, Esquire

101 Eisenhower Parkway, Suite 412
Roseland, New Jersey 07068
Phone: (973) 287-0964
Fax: (973) 226-4104
egoldman@aystrauss.com
gazzinari@aystrauss.com